## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA
        Plaintiff,

                v.

FOURTEEN (14) PIT BULL-TYPE DOGS
SEIZED IN MONROE, MAINE,
        Defendants *in rem*

No. 1:24-cv-00183-JAW

### VERIFIED AMENDED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America, by its attorneys, Darcie N. McElwee, United States Attorney for the District of Maine, and Nicholas S. Heimbach, Assistant United States Attorney, in a civil action of forfeiture in accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure, alleges as follows:

### *Nature of the Action*

1.      This is a civil action *in rem* brought to enforce 7 U.S.C. § 2156(e) for the forfeiture of fourteen (14) pit bull-type dogs that were involved in a violation of the animal fighting venture prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156.

2.      Because this Verified Complaint is being filed for the purpose of establishing grounds for forfeiture and providing notice to interested persons, it does not include all of the information known by the government in connection with the investigation underlying the claims for forfeiture set forth herein.

### *Defendants in Rem*

3.      The Defendants *in rem* were seized on about June 22, 2023, by the United States Department of Agriculture - Office of Inspector General ("USDA - OIG"), from the

yards and residence of David Frazer, located at 446 West Main Street, Monroe, Maine, pursuant to a federal search warrant and are described as follows:[1]

a.) USMS ID USM-001: a red or auburn, female pit bull-type dog;

b.) USMS ID USM-002: a red/white, female pit bull-type dog;

c.) USMS ID USM-003: a red, female pit bull-type dog;

d.) USMS ID USM-004: a champagne-colored, female pit bull-type dog;

e.) USMS ID USM-005: a blonde, male pit bull-type dog;

f.) USMS ID USM-006: an apricot, female pit bull-type dog;

g.) USMS ID USM-007: an apricot, female pit bull-type dog;

h.) USMS ID USM-008: a red/white, female pit bull-type dog;

i.) USMS ID USM-009: a red, male pit bull-type dog;

j.) USMS ID USM-010: a tan, female pit bull-type dog;

k.) USMS ID USM-011: a red/white, male pit bull-type dog;

l.) USMS ID USM-012: a fawn or red/white, male pit bull-type dog;

m.) USMS ID USM-013: an auburn or red/brown, female pit bull-type dog; and

n.) USMS ID USM-014: a red, male pit bull-type dog;

The Defendants *in rem* are hereinafter collectively referred to as the "Defendant Dogs." The Defendant Dogs are currently in the custody of the United States Marshals Service ("USMS") and being cared for by a USMS contractor. The Defendant Dogs are maintained as Asset ID 23-AIG-000023.

---

1    The USMS assigns each dog an identification number, such as USM-XXX.

4.      The Defendant Dogs are subject to forfeiture to the United States pursuant to 7 U.S.C. § 2156(e), as animals involved in a violation of the federal animal fighting venture prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156.

### *Jurisdiction and Venue*

4.      Plaintiff brings this action *in rem* in its own right to forfeit the above listed Defendant Dogs *in rem*. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355.

5.      This Court has *in rem* jurisdiction over the Defendant Dogs *in rem* pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in the District of Maine.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this District, and pursuant to 28 U.S.C. § 1395(a), (b), because the action accrued in this District and the Defendant Dogs *in rem* were found and seized in this District.

7.      Upon the filing of this complaint, the Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the Plaintiff will execute upon the Defendant Dogs *in rem* pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

### *Statutory Basis For Forfeiture*

8.      The Animal Welfare Act, 7 U.S.C. § 2131, *et seq*., defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment . . . ." 7 U.S.C. § 2156(f)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1).  It is also illegal to sell,

buy, possess, train, transport, deliver, or receive an animal intended for use in an animal fighting venture. 7 U.S.C. § 2156(b).

9.      The Animal Welfare Act provides that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(e).  Animals "seized under such a warrant shall be held by the United States marshal or other authorized person pending disposition thereof by the court in accordance with this subsection." *Id*. In addition, "[n]ecessary care including veterinary treatment shall be provided while the animals are so held in custody." *Id*.

10.      The statute also contemplates forfeiture of seized live animals. Specifically,

> [a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct.

*Id*. The costs incurred in caring for animals seized and forfeited under this section "shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business." *Id*.

11.      As explained below, the Defendant Dogs *in rem* are animals "involved in [] violation[s]" of 7 U.S.C. § 2156 and are therefore subject to forfeiture to the United States of America pursuant to 7 U.S.C. § 2156(e).

4

### *Background*

12.    In the United States, dogfighting ventures involve dogs including "pit bull"-type dogs, which dogfighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. A dogfight occurs when two dogs are knowingly released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when a dog kills the other dog or both dogs die. Winners of dog fights may receive financial awards. Betting is also common at dog fights.

13.    Organized dogfights often occur in a low-walled, rectangular, or square enclosures referred to as a "pit" or "box." The enclosures can be constructed with plywood and dimensional lumber to allow for transport and convenient assembly/disassembly. Alternatively, the walls of the corner of a room or basement can serve as an improvised pit. The "pit" serves to keep the fighting dogs confined while engaged in the fight. Dogfighting pits often use carpeting as a floor within the enclosure to provide traction for the fighting dogs and to absorb blood from injuries sustained during the fight.

14.    One sign of a dogfighting venture is the presence of pit bull-type dogs on heavy or excessive chains or housed individually in pens or crates. Because of their conditioning and training, dogs used in animal fighting ventures are typically housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Persons engaged in dogfighting take steps to restrain or isolate dogs used for fighting from one another to prevent them from fighting at unintended times. They may also keep younger dogs they intend to use for fighting

out of reach of other dogs to discourage normal socialization. Heavy chains, also known as logger chains, are often used when restraining dogs for the dual purposes of controlling the strong animals and developing strength to prepare for fighting.

15.     Dogfighters may fight dogs with a goal of obtaining "Champion" ("Ch") or "Grand Champion" ("Gr Ch") status for their dogs, which is achieved by winning three or five fights, respectively. Dogfighters may maintain contact with other dogfighters around the country and can generate substantial income from gambling on dogfights and from the sale and breeding of fighting animals.

16.     Dogfighters are known to maintain successful or high-potential fighting dogs for long periods of time so that they can continue to profit off of those dogs from future dog fights or from selling offspring or breeding rights. The more fights a dog wins, the higher that dog's value, for either offspring, breeding, or sale to another dogfighter.

17.     Dogfighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for fighting purposes.

18.     Those involved in training and exhibiting fighting dogs commonly possess several dogs at one time for several reasons. Dogfighters may refer to a location housing fighting dogs as a "yard." Dogfighters maintain a stock of dogs at different weights and

of both sexes because in dogfights, dogs are matched against other dogs to within a pound of the same weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match being solicited by an opponent. Dogfighters typically keep a "yard" housing several to many fighting dogs, so that they can have different weights, sexes, fighting abilities, and recovery cycles (dogs in different stages of recovery from previous fights) to choose from when seeking or agreeing to "hook" a match.

19.    Dogfighters also maintain multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dogfighting bloodline. Dogfighters commonly store dog semen in frozen form to later use in breeding.

20.    Further, dogfighters may possess an inventory of dogs because dogs often die or are badly injured during fights. Possessing multiple dogs also increases the prospects of owning a dog who will become a Champion or Grand Champion. Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

21.    Not all dogs in a litter of puppies bred from fighting dogs will show inclination to fight. Dogfighters refer to dogs who do not demonstrate fighting instinct by the time they reach maturity as "cold" or "shy." Because such dogs have no value to a dog fighting operation—either in actually fighting or in selective-breeding programs to develop the most dog-aggressive dogs—they are often culled, to use a word employed by dog fighters. To avoid public scrutiny, dogfighters typically do not sell these dogs to non-dogfighters or take them to an animal shelter. "Culling" generally results in the death of these animals. Federal agents are aware of dogfighting targets and defendants having

7

killed dogs by shooting them, strangling them, bludgeoning them, or drowning them. Dogfighters often bury or otherwise discard the carcasses of culled dogs. Additionally, dogs killed in a dogfight are also often buried or otherwise discarded.

22.     Dogfighters also routinely test and evaluate ("roll") their dogs to determine those that exhibit aggressive behavior, including against their own dogs.

23.     The most common way that a dogfighter tests a particular dog to ascertain whether the dog is "game" is to "roll" or "bump" the dog. A "roll" is a dog fight conducted for purposes of "game-testing" rather than for wagering. "Roll" fights generally last from five to fifteen minutes, at which point the handlers usually stop the fight. However, "roll" fights can result in serious injury or death to one or both dogs. "Rolls" are sometimes referred to as "bumps." "Roll" or "bump" fights are sometimes conducted in an enclosed fighting pit or improvised enclosed area similar to that which would be used for a contract match.

24.     Dogfights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several weeks before the dog fight, often referred to as a "match," "fight," or "show." Dogfights may be organized under the cover of a "weight pulling competition." The owners or handlers typically agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective owners or handlers.

25.     It can be challenging for dogfighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year and for a wager that is mutually agreeable to both parties. For that reason, dogfighters often rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dogfighters often "call out a weight" to known dogfighters in several states to increase their odds of finding a match.

26.     Once a dogfighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then undergoes a conditioning process dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program that may include the use of: treadmills, "slat mills," "carpet mills," "cat mills," "jenny mills," and exercise wheels used to run and exercise the dogs away from public view; weighted chains and pulling devices used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; hides or other material used as hanging devices to strengthen or condition dogs; water-based training such as tethering a dog to a cable running across a pool; and the administration of drugs, vitamins, and other medicine. Dogfighters use legal and illegal drugs to increase the strength and stamina of their fighting dogs, including using anabolic steroids to build muscle mass and aggression. Dogfighters also often use "break sticks" to separate fighting dogs at pre-determined intervals during a dogfight.

27.     Such items are integral to the ongoing maintenance, training, and fighting of a yard of fighting dogs. Certain items, such as a hanging scale, slatmill, or flirt pole,

9

would receive daily or near-daily ongoing use and are routinely found in the immediate vicinity of the dogs or in a residence on the property. Additionally, some of these items, such as a jenny mill or a "cat mill," or the heavy chains to which many fighting dogs are affixed (with a buried car axle on the other end), are far too large, heavy, and/or difficult to move, conceal, or dismantle. Others, like a slatmill, represent a significant monetary investment by the owner, and are not lightly parted with. Once obtained, it is common for dogfighters to continue to maintain and use such items until they have reached the end of their service life or are seized.

28.     Those who breed dogs for animal fighting ventures often use and possess "breeding stands," which are devices used to immobilize a female dog for breeding when the female dog is too dog-aggressive to mate naturally. Such devices are used exclusively to breed fighting dogs, as legitimate breeders would not choose to breed a dog who was too aggressive to mate naturally.

29.     Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place at a dogfighter's "dog yard" or indoors away from public view, often in a basement.

30.     Dogfighters will actively condition a dog for approximately eight weeks in between "hooking" a match and the fight itself. Following a match, if the dog survives, the handler will typically allow the dog several months to recover from injury, before re-assessing that dog's fighting fitness and hooking him or her for the next match. It would not be uncommon for a dog fighter to match (fight) a particular dog no more than once every nine to twelve months. Thus, the active career of a successful fighting dog could span several years, during which time the dog would remain in the owner's custody.

10

31.    Dogfighters typically do not start setting up matches for a dog until the dog reaches at least eighteen months to two years of age. Until then, dogfighters may test the dog out by "rolling" it or having the dog participate in short fights to assess the dog's demeanor. Thus, it is common for dogfighters to possess multiple young pit bull-type dogs who are in the process of being trained to fight.

32.    Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears. Scars from organized dogfights are commonly found on the face and front legs, as well as on hind ends and thighs.

33.    However, it is not uncommon for dogs possessed for the purpose of participation in a dogfighting venture to lack scarring and wounds indicative of dogfighting activities. Dogfighters may possess certain dogs for the sole purpose of breeding. Additionally, a dog may lack scarring for a variety of reasons, including its fighting prowess, because it has yet to be fought (either because it is too young or because its handler had yet to find an appropriate match for the dog's sex and weight), or because it is being used exclusively for breeding purposes.

34.    Developing and proving a fighting dog's "bloodline" or breeding lineage is of great importance to dogfighters for several reasons, including: to track the dogfighting "wins" of a dog and its predecessors, to ascertain whether certain fighting traits or physical characteristics were passed on or likely to be passed on, to show that a dog's predecessors were proven fighting dogs or bred by notable dogfighters, and to provide provenance that affects the market value of a dog for sale, breeding, or wagering on dogfights. It can take years or even decades of continuous possession of fighting dogs for a dogfighter to fully develop a fighting "bloodline" to his or her satisfaction.

35.     Some dogfighters are selective about who they will sell fighting dogs to because the success of that dog in the fighting ring will reflect on the seller whose bloodline is represented by the dog. A dog that produces multiple offspring that go on to be "Champions" (*i.e.*, winning three or more dog fights) is bestowed the "Register of Merit" ("ROM") title. This provides incentive to the seller to sell dogs to capable dogfighters, with the intention that the dogs will be fought.

36.     Commonly, those operating or participating in dogfighting ventures maintain pedigrees, books, records, ledgers, and journals relating to the possession, purchase, transportation, sale, breeding, and training of fighting dogs. These materials exist in both hard and electronic copy and are frequently transmitted through the Internet on websites, forums, email, and social media. The "pedigree" of a fighting dog frequently shows the dog's name, with reference to the dogfighting "kennel" from which the dog comes, as well as breeding lineage going back multiple generations, with reference to the number of fights won by the dog and its predecessors. Pedigrees are important in the dogfighting "industry" because they allow dogfighters to maintain information on whether a particular "bloodline" or breeding combination resulted in desired fighting traits.

37.     Dogfighters also post dog pedigrees on the website http://www.apbt.online-pedigrees.com, known as "Peds Online" or "Online Peds." Dogfighters use this as a repository for breeding information to prove and verify the lineage of their dogs or dogs they are fighting against or considering buying for breeding purposes or breeding with their dogs. The pedigree for each dog often contains: an indicator of how many fights the dog has won, whether the dog is a "Champion" or a "Grand Champion," the breeding history of the dog going back four generations, and

indicators of the number of fights that dogs in their bloodline have won. There is also a field for "Breeder" and "Owner." Some pedigrees have pictures of the dogs. Each pedigree has a unique six-digit number that appears in the webpage internet address for that particular pedigree. Dog fighters transmit hyperlinks to these fighting dog pedigrees by e-mail, text message, and social media.

38.     Historically, "underground" dogfighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online versions of published magazines that serve the same purpose, as well as websites where dogfighters post pedigrees to demonstrate the fighting lineage of their dogs. Dogfighters also often maintain detailed ledgers and journals that specifically depict how certain dogs performed during a particular fight, together with the duration and outcome of fights.

39.     Dogfighters today tend to communicate with each other via text messages and social media like Facebook, email, or website chat rooms dedicated to "game dogs." Dogfighters routinely "hook" matches and exchange documents, expertise, photographs, or videos relating to dogfighting activities via email and other electronic means. Social media offers individuals who engage in animal fighting the ability to communicate using text messages and audio calls, transmit and receive pictures and videos of animal fighting, and establish and widen animal fighting networks. Public and private Facebook groups dedicated to dogfighting exist. Dogfighters exchange photographs and videos of dogs, for example, to demonstrate a dog's conformation or build, gameness, and other

fighting qualities, when soliciting or advertising a dog for purposes of breeding, buying, or arranging a fight.

40.     Dogfighters sometimes breed their own fighting dogs from dogs they already own, and sometimes buy fighting dogs from other dogfighters, either as adult dogs or puppies. When dogfighters acquire dogs from other dogfighters, they sometimes do so in order to integrate desired fighting traits or "bloodlines" from other dogfighters into their own stock.

41.     The transportation of dogs possessed, bought, and sold for the purpose of dogfighting serves an important role in the dogfighting industry based on the geographic dispersion of dogfighting across the United States and the world. Individuals referred to as "transporters" are employed to convey dogs to and from subjects in different physical locations. "Transporters" often use vans or trucks to move dogs across the country and beyond.

### *Factual Basis for Forfeiture*

42.     At all times relevant to this Complaint, John Murphy ("Murphy") was a resident of a specific address in Hanson, Massachusetts (the "Hanson Premises") and David Frazer ("Frazer") was a resident of 446 West Main Street, Monroe, Maine (the "Monroe Premises").

## I.     INTERSTATE DOGFIGHTING INVESTIGATION

43.     In 2021, the Suffolk County, New York, District Attorney's Office initiated an investigation of subjects involved in dogfighting ventures in the Suffolk County area. As part of that investigation, the Suffolk County District Attorney's Office conducted a series of wiretaps pursuant to court orders.

44.    The intercepted wire communications indicated that the subjects in the Suffolk County, New York investigation were communicating with individuals involved in dogfighting ventures in other states.

45.    In September 2021, the Suffolk County District Attorney's Office obtained a court order permitting the USDA - OIG to use the intercepted communications.

46.    Using those intercepted communications and/or based on further investigation following those communications, Special Agents from USDA - OIG, working in conjunction with the U.S. Attorney's Offices for the District of Maine, the District of Massachusetts, and the Middle District of Florida, identified a number of individuals believed to be participating in an interstate network of dogfighters.

## II.    MURPHY AND THE HANSON PREMISES

### A.    Preliminary Investigation

47.    In the course of USDA - OIG's interstate investigation, agents identified Murphy as a participant in the interstate network of dogfighters.

48.    Wire intercepts, surveillance and/or searches of Murphy's Facebook accounts, and aerial and ground surveillance of the Hanson Premises revealed that Murphy was involved in the breeding, fighting, and training of fighting dogs at the Hanson Premises.

49.    During the investigation, law enforcement identified two Facebook accounts associated with Murphy under the usernames "John Mac Murchaidha" and "Séamus Sugar."

50.    In April 2022, photos posted on the "John Mac Murchaidha" account displayed pit bull-type dogs, as well as references for "game dogs" and images depicting two pit bull-type dogs facing each other in apparent preparation to fight.

51.     The "Séamus Sugar" account belonged to a private Facebook Group titled "Scratch Dog Journal" known to law enforcement as a medium used by dogfighters to share the results of past fights, buy and sell dogs for dogfighting, exchange information on training and conditioning dogs for dogfighting, and engage in other dogfighting-related activities.

52.     In May 2021, the "Séamus Sugar" account posted a photograph to the "Scratch Dog Journal" Facebook Group of a pit bull-type dog wearing an unusually thick collar with the caption "Ch zorro" and a link to the pedigree information of the dog. Dogfighters often restrain their dogs with thick, heavy collars for the dual purposes of controlling the animal and building its neck strength to prepare for fighting. Dogfighters use "Ch" to identify a "Champion" dog.

53.     In April 2022, Murphy indicated on the "Séamus Sugar" account that he was considering "offering 1 or 2 pups to the public both parents are fine representation of everything that encompasses a bulldog." In the post, Murphy notes that a dog named "Cupcake," presumably the ancestor of the puppies offered for sale, was "1 point away" from "rom," with "1 win preventing her from history." Dogfighters commonly refer to pit bull-type dogs as "bulldogs." A dog that produces multiple offspring that achieve "Champion" status (i.e., winning three or more dog fights) is bestowed the "Register of Merit" or "R.O.M." title.

54.     Several photographs posted to the ""Séamus Sugar" account display dogfighting paraphernalia. One photograph displays a 2004 issue of the dogfighting magazine *Sporting Dog Journal.* Other photographs show records concerning frozen semen storage for specific dogs named "Sismo" and "Alpo;" a pit bull-type dog restrained in a breeding stand; multiple veterinary supplements, including an anabolic

16

androgenic steroid; and a pit bull-type dog with discolorations on its head and front leg consistent with scarring of the skin. Pit bull-type dogs that survive dogfights often sustain wounds to their body which may heal and scar.

55.     Videos posted to the "Séamus Sugar" account on May 13, 2019, February 18, 2020, and March 3, 2021, depicted pit bull-type dogs physically tethered to various carpet and/or slat mills. Dogfighters commonly use these treadmill-like devices to physically condition dogs in preparation for a dogfight. One of the videos depicted an apparently live raccoon caged in front of the carpet mill, presumably to serve as a stimulus for the pit bull-type dog.

56.     The "Séamus Sugar" account also contained communications between Murphy and other dogfighters via Facebook's messaging application. In June 2019, for instance, Murphy discussed breeding and purchasing dogs with another subject. Murphy claimed that he "champed out more dogs in the last 4 years than this guy can name from and old SDJ [likely, *Sporting Dog Journal*] mag lol." Additionally, in April 2022, Murphy messaged the Facebook account of "John Jacob Jinglehimer" and described the results of several dogfighting matches.

57.     Aerial surveillance of the Hanson Premises on March 23, 2022, and April 7, 2023, revealed a stockaded enclosure as well as what agents believed to be outdoor housing structures for fighting dogs based on the type, number, construction, and layout of the structures. On both occasions, the surveilling agent observed one or more dogs within or immediately outside of the enclosure.

58.     With the use of a pole camera, law enforcement documented pit bull-type dogs present at the Hanson Premises in each month from August 2022 through May 2023. Additionally, on March 14, 2023, a local animal control officer responded to a

citizen report of a "dog tethered outside" the Hanson residence in violation of Massachusetts law. The animal control officer met with Murphy at the Hanson Premises. The animal control officer reported observing an "American bully" dog tethered in the yard, "what looked to be 2-3 small kennel runs set up behind a stockade fence," and a "young pit type puppy" inside the residence. Murphy provided a business card to the animal control officer that listed "(774) [xxx]-5000" under the name "John Murphy."[2]

59.     On June 3, 2023, at 11:08 a.m., the pole camera documented a male—who law enforcement believes to be Murphy—load a pit bull-type dog into an animal transport crate in the cargo area of a Jeep Cherokee parked in the driveway of the Hanson Premises. The Jeep Cherokee departed the driveway of the residence at approximately at 11:11 a.m.

60.     On June 4, 2023 at 12:26 a.m.—approximately 13 hours later—the pole camera captured a vehicle that law enforcement believes to be the Jeep Cherokee returning to the Hanson Premises and parking in the driveway. A male who law enforcement believes to be Murphy exited the vehicle and entered the residence. Law enforcement did not observe a dog or animal transport crate exit the vehicle or otherwise present and visible upon the return of the Jeep Cherokee to the Hanson Premises.

61.     Verizon Wireless records reflect that "(774) [xxx]-5000"—the number identified as used by Murphy—texted the telephone number "(207) [xxx]-0401" at 9:15 a.m., 9:15 a.m., and 11:43 a.m. on June 3, 2023. USCellular records reflect that "(207)

---

2       To avoid the unnecessary disclosure of telephone numbers associated with Murphy and Frazer, portions of the telephone numbers referenced herein are redacted.

[xxx]-0401" was assigned to an account in the name of a relative of Frazer. The same relative was listed as an owner of the Monroe Premises. Frazer was an authorized user of the USCellular account.

**B.     Search of the Hanson Premises**

62.     On June 7, 2023, Special Agents with the USDA - OIG, with the assistance of other federal and local law enforcement, executed a federal search warrant at the Hanson Premises, simultaneous with the execution of warrants at other residences in Massachusetts, Maine, and Florida.

63.     Upon execution of the warrant at the Hanson Premises, law enforcement found evidence consistent with participation in dogfighting activities.

64.     In executing the search warrant, law enforcement seized nine pit bull-type dogs. Several of the dogs had scarring indicating that they had been involved in organized dogfighting. Consistent with dogs possessed and/or trained for participation in an animal fighting venture, the dogs were found restrained or housed separately.

65.     Additionally, a number of items commonly associated with dogfighting ventures were observed at and/or seized from the Hanson Premises. For example:

    a.     Veterinary supplies. Dogfighters often attempt to mend the injuries of their dogs rather than seek legitimate veterinary care, which may raise suspicion regarding the cause of injuries. Thus, it is common to find veterinary supplies where dogs involved in dogfighting are being kept. Dogfighters often keep and administer medications intended for use on other species. Among other items, agents seized several types of antibiotics; several types of deworming medication; wound care materials; medical supplies (including syringes, intravenous kits, and hemoglobin

19

test kits); several types of fertility medications; several types of steroids; doses of vaccines (against canine distemper, adenovirus type 2, parainfluenza, parvovirus (expired), and Lyme disease (expired)); painkillers; and several nutritional supplements from the Hanson Premises;

b.     Issues of *Sporting Dog Journal, Bulldog Review,* and other magazines chronicling the results of dogfights and advertising fighting dogs and kennels;

c.     Various "keep" regimens, found in correspondence, notebooks, published booklets, and on a whiteboard, prescribing a dog's training and diet in preparation for a fight;

d.     American Dog Breeders Association Pedigree Certificates and Registration Certificates, which dogfighters use to establish bloodlines and market their dogs;

e.     Printouts of fighting dog pedigrees from the database "Peds Online";

f.     Records, including veterinary invoices and certifications, dog licenses, and purchase receipts;

g.     Flirt poles, which dogfighters use to entice a dog to chase a stimulus;

h.     Several treadmills, slat mills, and carpet mills;

i.     A jenny mill, which dogfighters use to develop a dog's endurance and musculature by enticing the animal to run on a circular track;

j.     Break sticks, which dogfighters use to force open a dog's bite onto another dog's body, specifically at the termination of a fight or while training;

k.     Digital scales, which dogfighters use to weigh their dogs for matches;

l.   Disposable skin staplers, which dogfighters use to attempt to close wounds resulting from dogfights;

m.   A breeding stand;

n.   Kennels and crates used to house dogs individually; and

o.   Invoices and other communications from veterinary clinics concerning dog semen storage.

### III.   MURPHY'S AND FRAZER'S COMMUNICATIONS

66.   Pursuant to the federal search warrant, law enforcement searched the cellular telephone used by Murphy, which was located in the master bedroom of the Hanson Premises. The phone was associated with/used telephone number "(774) xxx-5000". The cellular telephone contained multiple dogfighting videos as well as significant content related to dogfighting generally.

67.   The search of the telephone also revealed a text message conversation between Murphy and telephone number "(207) xxx-0401". Murphy saved the contact associated with that telephone number as "Dave Frasier Maine."

68.   The text message conversation between September 27, 2019, and June 3, 2023, involved the discussion of dozens of dog pedigrees, references to suspected dogfight performance and results, numerous pictures of pit bull-type dogs housed in a manner consistent with dogs possessed for the purpose of dogfighting, and two separate news-article links regarding dogfighting-related law enforcement operations. Additionally, Murphy stated "the feds" arrested his friend in a conversation regarding dogs and the avoidance of "unwanted attention" in a message sent on November 3, 2019. Frazer both sent and received pedigree links.

21

69.     As an example of their communications, Murphy sent a message to "Dave Frasier Maine" on May 28, 2023, stating, "I'm gonna make 1 of those sheezy dogs a champion for you. Watch." Law enforcement believes Murphy was stating his intent to train one of Frazer's dogs to prepare for dogfights as well as handle dog(s) in dogfight(s) to achieve three or more wins over other dogs earning the title of "champion."

70.     Additional examples of communications between Frazer and Murphy located on the telephone seized from the Hanson Premises are included below.[3]

a.   On December 4, 2019, Murphy texted, ". . . I wish you would get on board with me and team up.  The 3 dogs you got there I can create a family of winning dogs that would generate income but it would take a commitment and work that's the only way dogs an make money is if they male a lil noise."

b.   On February 2, 2020, Murphy texted, ". . . theres a lot of trouble out there all over the news.  Keeping head low tell bbn you more later hope all is well."

c.   On July 31, 2020, Frazer texted, "Can you maybe order a med kit for me?  It would be superhandy for the farm..I could actually use it right now...Wish I still had my staple gun."

d.   On September 9, 2020, Frazer messaged, ". . . Can you ask [Murphy's significant other] to change the auto-ship to 4 weeks instead of 5?  Or maybe send me the food money so I can keep everything consistent and not switch up varieties." Chewy.com is an online retailer of pet food and other pet products. Records from Chewy.com confirm that the individual believed to be Murphy's significant other—and who used the Hanson Premises as their

---

3       Quotations in this paragraph include errors that were in the original messages.

address—ordered and paid for shipments of dog food sent to Frazer at the Monroe Premises on about: November 19, 2019, December 18, 2019, February 1, 2020, March 20, 2020, April 18, 2020, May 23, 2020, June 27, 2020, August 1, 2020, September 11, 2020, October 9, 2020, November 6, 2020, December 4, 2020, December 31, 2020, July 14, 2021, October 7, 2021, December 14, 2021, January 22, 2022, March 14, 2022, June 8, 2022, July 26, 2022, September 5, 2022, October 8, 2022, November 12, 2022, December 16, 2022, January 21, 2023, February 25, 2023, April 1, 2023, May 6, 2023, and June 11, 2023.

e.  Between January 31, 2021, and February 2, 2021, Murphy and Frazer exchanged multiple messages including:

> Murphy: Do u think I should head up early Monday? We can bang out some house I got nail gun and saw all cordless and chains are built

> Frazer: Probably. I'm guessing materials will be here by noon. Gonna need some straw. I have shavings but those are better for warm weather

> Murphy: Depending on weather I'll be up. With straw and wormer

> Frazer: Ok

> . . .

> Murphy: Once i get up we can bang it all out fast especially if you got it all prepped. Do u have any pallets ?

> Frazer: Yeah, I have a few pallets.

> Murphy: Ok great

> Murphy: I really appreciate you partnering up on this is you have no idea how seriously helpful this is I need to really lay low till this blows over

. . .

Murphy: Do you have axels?

Frazer: There are three open spots with full chain setups. Markus spot needs a new chain.

Murphy: Awesome

Murphy: I got a bunch of chain I'm gonna move the 3 dogs there im gonna put em at a buddies place inwsnt my most important stuff with you

. . .

f.   Messages exchanged on February 3, 2021, demonstrate that Murphy traveled to Maine to meet with Frazer.

g.   On August 10, 2021, Murphy sent a hyperlink to Frazer for a news story regarding the arrest of ten people and seizure of eighty-nine dogs in connection with an alleged interstate dogfighting ring. Frazer replied, "Interesting…Mostly older dudes." Murphy responded, "I'm very close ton3 of them."

h.   On January 16, 2022, Murphy texted, ". . . I'm gonna have [another subject] come grab a couple dogs probably frank and that crazy old little white dog lol. I wanna move them and put my 2 important skinny dogs with you for safe keeping till spring also the ole lady has not come in heat yet. I also made an appointment to get your male the brother to the ole lady collected so u can have swmen [sic] off him for future ill grab him when I come up if that what u wanna do."

i.   Between January 25, 2022, and January 28, 2022, Murphy and Frazer exchanged multiple messages including:

24

Murphy: Cops are at javy place in maine

Frazer: Well then I certainly won't be looking for a way to grab houses

Murphy: I'm so happy my dogs are with u

Murphy: When I bring sheezy home I'll take male to.collect

Frazer: Cool. Just got a chewy drop from FedEx

. . .

Murphy: Cops left. Javy going to move the dogs.  In near future let's ill rent a u haul we can grab some houses and chains

Murphy: I brought sheezy in the house. Maybe it will help heat

Murphy: Also javs place tou can grab houses and.chains

Frazer: I'll see if I can figure something out as far as a ride

Frazer: Penelope is in heat

Murphy: Thanks for the heads up bro

j. On September 25, 2022, Murphy sent Frazer a hyperlink to a pedigree on "Peds Online". Murphy then texted, "Hes ready to come back to you to add to your program he collected 2 forfeits hes a super good dog." Frazer responded, "Nice. Now I just gotta figure out how I'm gonna pay for transport."

k. Between March 13, 2023, and March 17, 2023, Murphy and Frazer exchanged multiple messages including:

Murphy: Dave Animal control was here

Murphy: I'm gonna have to hide a few up there if possible

Frazer: When and how many? I'll need to prep spots. I also work this coming weekend

Murphy: As many as you say I'm in a bad way if they come I'm fucked

> Frazer: Was at work earlier . . . [ellipses in original] I have two open spots with houses and chains. I'll need more setups and housing.

> Frazer: How many do you have to move?

> Murphy: 4 maybe 5 just till it cools down. I got chains

> Murphy: 1 is a male u can use as a stud hes a pure Hollingsworth bull dog

> Murphy: I have [another male] coming I'm sending as many as I can down south to another buddy

> . . .

> Murphy: Ok sorry man its been crazy for me. I've been moving and sellin stuff through my back out. Had to take today off work. I have 3 important ones to stash with you. 1 male you can use as a stud. Hes gonna help your dogs out. I want you to breed him and I'm gonna help you develop your line of dogs tou are gonna have to trust me

> Murphy: Let me guide you a little. Once it gets to where i believe it's gonna be good for you. You will be able to sell pups before they're born

> Murphy: I'll be up tomorrow I got 3.

> Murphy: 2 young females and the male that's gonna be a stud to your dogs

l.  On March 17, 2023, Murphy also texted, "I got a few dogmen looking forward to the breedings off your dogs. Place a few in their hands get some wins and you are separated from the pack."

m.  On March 24, 2023, Murphy sent the following messages, among others, to Frazer:

> Murphy: Me and [another subject] wanted to see if you wanna partner up. I wanna start competing again. If you can take on more dogs. Basically I'll just focus on the competition part. We will get your 4 wheeler and trailer going. Make

houses and chains. Buy all food. Pay you 400 a month and we will split 3 ways all pups sales. You can breed to any of the studs with your own dogs and keep all those pup sales 100. Let me know your thoughts. I'd like to make 1 last run before I retire with the dogs

Murphy: Of that's too much to taken on we understand

Murphy: If

Murphy: I feel we can make a good run at the history books

n. On May 27, 2023, Frazer notified Murphy of the death of one of the dogs. Murphy replied, in part, "Her brother eddie was a good 1 she was a winner and her 3 brothers were as well she was th3 last 1," and "When she was in shape 6 years old we won in 31 mins."

o. On June 3, 2023, Murphy and Frazer exchanged multiple messages including:

Murphy: Gonna head up shorly

Murphy: Got an old gal with me shes 10. Gonna put her up till she comes in heat

Murphy: On way

Frazer: OK. Can we hit TSC while you're here? Getting low on supplies . . .[ellipses in original]

The term "heat" likely refers to the ability of a female dog to accept a male dog for the purpose of conceiving. Law enforcement believes Murphy was informing "Dave Frasier Maine" that he was bringing a 10-year-old dog to "Dave Frasier Maine" to be housed until she was in heat. In this context, "TSC" appears to mean Tractor Supply Company, a chain of retail stores that sells animal products including pet food.

71.    The search of the telephone seized from the Hanson Premises also revealed that the user of the phone had searched the Waze app for the address of the

27

Monroe Premises on multiple dates, including August 31, 2020, December 17, 2020, March 18, 2023, April 22, 2023, and June 3, 2023. The Waze app is a satellite navigation software application on smartphones and other electronic devices that relies on the Global Positioning System ("GPS") to provide users with turn-by-turn directions to a selected destination.

72.    In sum, communications between Frazer and Murphy located on the telephone seized from the Hanson Premises demonstrate that, between 2019 and June 2023: Murphy and Frazer exchanged pedigrees of fighting dogs from "Peds Online"; Murphy offered to train one or more dogs for Frazer; Murphy provided Frazer advice on breeding dogs and offered one or more dogs for Frazer to use for breeding purposes; the two discussed when different dogs were in heat; Frazer possessed and cared for several of Murphy's dogs, in addition to his own, at the Monroe Premises; Murphy arranged for supplies—such as regular shipments of dogfood—to be shipped to the Monroe Premises; Murphy traveled to Maine and partnered with Frazer to build items at the Monroe Premises; Murphy and Frazer arranged to transport, or cause others to transport, dogs to and from Maine, including for purposes of collecting semen, breeding, and hiding dogs from animal control authorities in Massachusetts.

## IV.   SEARCH OF THE MONROE PREMISES AND SEIZURE OF THE DEFENDANT DOGS *IN REM*

73.    Aerial surveillance at the Monroe Premises on June 16, 2023, revealed multiple dogs that agents believed to be housed in a manner consistent with possession for the purpose of dogfighting. At least three suspected dog houses were encircled by round-shaped patterns of bare ground commonly known as "chain spots," which are frequently created when a pit bull-type dog chained to a fixed point with heavy logger

chains wears away any surface vegetation within the range of the chain length. Such chains are often affixed to a buried car axle.

74.     On June 22, 2023, Special Agents with the USDA - OIG, with the assistance of local law enforcement, executed a federal search warrant at the Monroe Premises.

75.     Upon execution of the warrant at the Monroe Premises, law enforcement seized the fourteen Defendant Dogs *in rem* and observed and/or seized other evidence consistent with participation in illegal dogfighting activities.

76.     Frazer signed a form by which he surrendered the Defendant Dogs *in rem*. The form included a surrender acknowledgment stating:

> I certify that I legally own the animal(s) identified above (including on any attached lists or sheets) (collectively or in the singular, the "Animals") and that no other person has any rights or interests in the Animals. By my signature, I hereby relinquish all claims of ownership of the Animals and abandon title to the Animals. I understand that title to the Animals may vest in anyone and I have no desire to direct or control to whom title vests and have no intention of resuming or reasserting title to the Animals.

77.     Upon information and belief, Frazer possessed and/or owned the Defendant Dogs for the purpose of participation in a dogfighting venture.

78.     Contractors with the USMS observed that several of the Defendant Dogs had scarring consistent with those Defendant Dogs having been involved in organized dogfighting and/or breeding. Those dogs included:

    a.  USM-001. Estimated to be 12 years old, this dog was dehydrated. This dog had long nails; severe scarring on its face, front legs, and both sides of its neck; open wounds on its tail tip; and a missing ear tip. The dog was missing the majority of its nose, its upper incisors and upper and lower canines were

worn, and it was missing some of its canines. The dog had swollen wrists and swollen ankles.

b. USM-002. Estimated to be 5 years old, this dog had scars on its legs, face, and side likely from breeding. It had hair loss and worn upper and lower incisors. A puppy fetus was palpated on scene and required emergency surgery removal. The contractors noted that a recent litter was all dead due to complications and other dog activity on scene, and that the dog had black discharge. As noted below, four puppies were found dead within the residence at the Monroe Premises.

c. USM-009. Estimated to be 5 years old, this dog had long nails, scars on its face and legs consistent with dogfighting, and a heart murmur. It was also missing incisors.

79.    Contractors with the USMS observed that several of the Defendant Dogs that had significant scarring, wounds, or other injuries. Those dogs included:

a. USM-003. Estimated to be 7 years old, this dog had scars under its neck, long nails, scars inside its front legs consistent with dog bite, a fractured upper-right canine, and worn incisors.

b. USM-004. Estimated to be 2 years old, this dog had a scar on left-front leg, a scar on its nose, thinning hair on its right-rear ankle, a worn incisor, missing teeth, and crepitus in both knees and ankles.

c. USM-005. Estimated to be 1 year old, this dog had long nails, scars on both its front legs and nose, and hair loss top of its head.

d. USM-006. Estimated to be 1 year old, this dog had long nails, scars on nose, hair loss on top of its head, and a damaged pupil (possibly injury).

e.  USM-007. Estimated to be 2 years old, this dog had long nails and scars on its nose.

f.  USM-008. Estimated to be 3 years old, this dog had long nails, a scar on its nose, red-tinged discharge from its tonsils, and crepitus in its right-rear knee.

g.  USM-010. Estimated to be 2 years old, this dog had a scar on its right shoulder, hair loss, and dirty, inflamed ears.

h.  USM-011. Estimated to be 2 years old, this dog had long nails and scars on each shoulder.

i.  USM-012. Estimated to be 2 years old, this dog had long nails and scars on its front legs and face. This dog had scars consistent with dog bites.

j.  USM-013. Estimated to be 4 years old, this dog had splits in both ears.

k.  USM-014. Estimated to be 2 years old, this dog had scars on its face consistent with dog bites, some scars on its front legs, and was observed to hold its front paw at a different stance sometimes while standing.

80.  Consistent with dogs possessed and/or trained for participation in an animal fighting venture, the Defendant Dogs were found restrained or housed separately. At least ten of the Defendant Dogs were chained separately outside. Several of the Defendant Dogs were found wearing thick collars attached to metal chains. Individual housing—with surrounding "chain spots"—for the Defendant Dogs chained outside were separated into two areas on the Monroe Premises. One area was located approximately 150 feet southwest of the residence. The other was located farther into the wooded area behind the residence and was enclosed by an electric fence that was powered by the residence on the Monroe Premises. The physical fencing for the second area connected to the fencing immediately behind the residence.

81.     One Defendant Dog (USM-004) tested positive for giardia, a diarrhea-causing parasite; three (USM-008, USM-012, and USM-014) tested positive for Lyme disease; six (USM-003, USM-004, USM-005, USM-009, USM-011, USM-013) tested positive for hookworm; five (USM-003, USM-008, USM-010, USM-012, and USM-013) tested positive for anaplasma, a bacterial tickborne disease; one (USM-005) tested positive for roundworm; and two (USM-006 and USM-007) returned faint positive results for parvovirus.

82.     None of the Defendant Dogs appeared spayed or neutered at the time of seizure, which is common among dogs involved in an animal fighting venture.

83.     When executing the search warrant, Frazer also possessed ten Central Asian Shephard dogs in and around the Monroe Premises, which Frazer indicated were aggressive toward humans.

84.     Law enforcement observed the interior of the residence to be filthy. The basement smelled of decomposing biological material, with the floor largely covered with dog feces. A treadmill was also observed in the basement. Law enforcement observed a dead puppy on a sofa in one room, with three additional dead puppies found in another room. In or near a compost pile toward the rear of the residence, law enforcement located suspected canine bones. Law enforcement also located plastic trash bags containing decomposing animals.

85.     In sum, the condition in which the Defendant Dogs were found was not consistent with that of pet dogs of a comparable age.

86.     Additionally, a number of items commonly associated with an illegal dogfighting operation were observed at and/or seized from the Monroe Premises. For example:

a. Veterinary supplies, including:

   i. Several types of antibiotics, including amoxicillin (based upon a handwritten label), doxycycline, and cephalexin;

   ii. Several types of deworming medication, including turkey, chicken, and swine dewormer; goat dewormer; canine dewormer; and injectable ivermectin for cattle and swine;

   iii. Several flea and tick prevention collars;

   iv. Several nutritional supplements, including injectable vitamin B complex, colloidal silver, and vitamins/electrolytes;

   v. Medical supplies, including syringes;

   vi. Wound care materials, including bandages; butterfly closures; MicrocynAH wound & skin care hydrogel; wound care liquid; spray for wounds, fungus, scratches, rain rot, ringworm, ear infections, and hot spots; blood stop powder; first aid antiseptic solution; antiseptic wound dressing; amprolium oral solution coccidiostat; neomycin antibacterial oral solution; and antiseptic wound dressing oil;

b. Kennels, crates, and doghouses used to house dogs individually;

c. Dog collars;

d. Break sticks;

e. Multiple chains;

f. Car axles, including one buried in the ground with a chain attached;

g. Records, including certifications of vaccinations and veterinary invoices; and

h. American Dog Breeders Association registration certificates.

*Conclusion*

87.     Based on the information and allegations set forth herein, there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Dogs *in rem* are subject to forfeiture under the provisions of 7 U.S.C. § 2156(e).

WHEREFORE, the United States of America prays:

1.     That process of warrant issue for the arrest of the Defendant Dogs *in rem*;

2.     That due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

3.     That judgment be entered declaring the Defendant Dogs *in rem* forfeited to the United States of America for disposition according to law;

4.     That the Court enter a judgment for costs associated with the care of the Defendant Dogs *in rem* pursuant to 7 U.S.C. § 2156(e) should any interested party file a claim for the Defendant Dogs *in rem*; and

5.     That the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: May 30, 2024                    Respectfully submitted,

                                       Darcie N. McElwee
                                       UNITED STATES ATTORNEY

                          BY:     */s/ Nicholas Heimbach*
                                  Assistant United States Attorney
                                  United States Attorney's Office
                                  100 Middle Street
                                  East Tower, 6th Floor
                                  Portland, ME 04101
                                  (207) 780-3257
                                  Nicholas.Heimbach@usdoj.gov

VERIFICATION

I, Kyle Bishop, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the U.S. Department of Agriculture - Office of the Inspector General and as such have responsibility for the within action; pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Amended Complaint for Forfeiture *In Rem* and know the contents thereof; and that the same is true to the best of my knowledge, information and belief.

The sources of my knowledge and information and the grounds of my belief are the official records and files of the United States, information supplied to me by other law enforcement officers, and my investigation of this case together with other law enforcement officers.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of May 2024.

/s/ Kyle Bishop
Kyle Bishop
Special Agent
Office of Inspector General
U.S. Department of Agriculture


STATE OF MAINE
Cumberland, ss.

Subscribed and sworn to before me this 30th day of May 2024.

/s/ Kimberley P. Woodward
Notary Public

My commission expires:  11/19/2026